**O**

# United States District Court
# Central District of California

| | |
|---|---|
| GCIU-EMPLOYER RETIREMENT FUND, | Case № 2:16-cv-03391-ODW (AFMx) [Consol. w/ Case No. 2:16-cv-3418-ODW (AFMx)] |
| Plaintiff, | |
| v. | **ORDER AFFIRMING IN PART AND VACATING IN PART ARBITRATION AWARD [22, 23]** |
| QUAD/GRAPHICS, INC., | |
| Defendant. | |

## I.   INTRODUCTION

This case concerns withdrawal liability under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). Quad/Graphics, Inc. ("Quad") ceased contributing to a multiemployer pension plan called GCIU-Employer Retirement Fund ("Fund"). The MPPAA imposes liability on employers that withdraw from multiemployer pension plans, and thus the Fund calculated Quad's withdrawal liability and demanded payment. Quad disputed the Fund's calculation on several grounds, prompting the parties to submit the matter to arbitration. *See* 29 U.S.C. §1401(a)(1). The arbitration recently concluded, and both parties now petition this Court to affirm and vacate

opposing portions of the arbitration award. (ECF Nos. 22, 23.) For the reasons discussed below, the Court **AFFIRMS IN PART** and **VACATES IN PART** the arbitrator's final award, and **DISMISSES AS MOOT** the Fund's challenge to portions of the arbitrator's final award.

## II.    BACKGROUND

### A.    Statutory Background

Collective bargaining agreements ("CBAs") between an employer and an employee-union often require the employer to provide pension benefits to its employees. To ensure that these employees actually receive their promised benefits, ERISA requires the employer to contribute to a pension plan in an amount sufficient to cover those benefits. Moreover, where the plan is a multiemployer plan (as opposed to a single-employer plan), the MPPAA requires withdrawing employers to pay their share of the plan's unfunded vested benefits. This ensures that employer withdrawals do not bankrupt the plan. *See generally Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995).

A withdrawal is either partial or complete. 29 U.S.C. § 1381(a). A withdrawal is partial when the employer's obligation to contribute to the plan ceases under some, but not all, of the CBAs by which it is bound. *Id.* § 1385(a)(2), (b)(2)(A). A withdrawal is complete when the employer's obligation to contribute to the plan ceases under *all* CBAs by which it is bound. *Id.* § 1383(a)(1).[1] Moreover, withdrawal liability is assessed based on the "plan year" in which the employer withdraws, *see id.* § 1391, and the extent of the employer's liability can change substantially based on the particular plan year in which the withdrawal occurs.

### B.    Factual Background

Quad is an employer in the commercial printing business. (Arbitration Record ("AR") at 9, ¶ 2.) Quad maintains facilities at multiple locations within the United

---

[1] While there are other situations in which an employer partially or completely withdraws from a pension plan, *see* 29 U.S.C. §§ 1383, 1385, they are not relevant to this dispute.

States, and is bound by separate CBAs at each of those facilities. (*Id.* at 9, ¶ 4.) One of Quad's facilities is located in Versailles, Kentucky. (*Id.* at 9, ¶ 5.) In 2007, Graphic Communications Conference, International Brotherhood of Teamsters, Local 826-C ("Local 826-C") was the exclusive bargaining representative for the Versailles employees. (*See id.* at 349.) That year, Local 826-C entered into a CBA with Quad's predecessor, World Color (USA), formerly known as Quebecor World (USA), Inc. ("Quebecor"). (*Id.* at 349–411.) Quad acquired Quebecor in 2010, and the parties appear agree that Quad assumed Quebecor's obligations under the CBA. (*Id.* at 9, ¶ 3.)

The Versailles CBA contained two provisions relevant to the parties' dispute. The first concerned the manner in which employee vacation time accrued and was used. Under the CBA, employees received their yearly allotment of vacation time in a "bank" at the beginning of the year. (*Id.* at 12, ¶ 28.) Employees could use their vacation time at any time throughout the year, up until the end of the day on December 31. (*Id.* at 10, ¶ 8; *id.* at 12, ¶¶ 29–31.) Any unused vacation time left in the banks thereafter must be paid out to the employee by January 31. (*Id.* at 10, ¶ 9.) Thus, for example, if John Doe accrued 20 hours of vacation time over the course of 2008, Quad would credit 20 hours of vacation time in John's bank at the beginning of 2009. John could use this vacation time at any point up to December 31, 2009. Any unused vacation time left in the bank at the end of this period must be paid out to John on or before January 31, 2010.

The other relevant CBA provision concerned the timing of pension benefit payments. Under the CBA, Quad was required to make monthly contributions to the Fund. (*Id.* at 9–10, ¶ 7.) The CBA required Quad to calculate its monthly contribution obligation based on, *inter alia*, the hours worked by the employee that month and vacation time taken by (or paid out to) the employee that month. (*Id.*) Thus, the January payout of the previous year's unused vacation time triggered Quad's obligation to contribute to the Fund.

In December 2010, the Versailles employees voted to decertify Local 826-C as their exclusive bargaining representative. (*Id.* at 10, ¶ 11.) The National Labor Relations Board ("NLRB") certified the results of the election on December 27, 2010. (*Id.*) As of January 1, 2011, there were over 5,000 hours of total unused vacation time in the banks of Versailles employees. (*Id.* at 12, ¶ 33.) Quad paid out this vacation time to the Versailles employees on January 21, 2011, in the total amount of $84,953.62. (*Id.* at 13, ¶ 38.) On January 11, 2011, Quad submitted its contribution payment to the Fund for its Versailles employees in the amount of $48,445.20. This payment was for work performed and contributions due in December 2010. (*Id.* at 10, ¶ 14; *id.* at 13, ¶ 36.)

Because the decertification voided the CBA—and therefore cut off Quad's obligation thereunder to contribute to the Fund—Quad notified the Fund of the decertification. (*Id.* at 10, ¶ 13.) While calculating Quad's withdrawal liability, the Fund concluded that Quad's contribution obligation under the Versailles CBA ceased in 2010.[2] (*Id.* at 11–12, ¶ 27; *id.* at 14, ¶¶ 45–46.) The Fund also concluded that Quad's contribution obligation under the CBAs governing Quad's other facilities ceased in 2011 (except for the Memphis facility, which previously withdrew in 2009). (*Id.* at 11–12, ¶ 27.) As a result, the Fund assessed liability for a 2010 partial withdrawal (for the Versailles facility), and a 2011 complete withdrawal. (*Id.* at 10, ¶ 15; *id.* at 11, ¶ 17.) Quad disputed that its obligation to contribute under the Versailles CBA ceased in 2010, and thus argued that the Fund should not have assessed liability for a 2010 partial withdrawal. (*See id.* at 11, ¶ 18.) The allegedly erroneous assessment increased Quad's total withdrawal liability by approximately

---

[2] An assistant administrator at the Fund originally concluded that none of Quad's facilities withdrew in 2010. (AR at 13, ¶ 40.) Concerned that not assessing liability for a 2010 partial withdrawal would lead to a substantial loss of revenue, a Fund actuary instructed the administrator to find that at least one of Quad's facilities withdrew in 2010 rather than 2011. (*Id.* at 13–14, ¶¶ 41, 44.) The administrator obliged, finding that Quad's Versailles facility withdrew in 2010. (*Id.* at 14, ¶ 45.) While this might suggest impure motives on the part of the Fund, neither the arbitrator nor Quad made any argument that these communications have any effect on the date of Quad's actual withdrawal.

$20 million.  (*Id.* at 13, ¶ 42.)  Finally, in assessing Quad's liability for the 2011 complete withdrawal, the Fund applied a partial withdrawal credit (for the 2009 Memphis partial withdrawal) before applying the MPPAA's 20-year payment cap on withdrawal liability.  (*Id.* at 15, ¶¶ 55–56.)  Quad contends that the Fund should have applied the 20-year cap before the partial withdrawal credit, and that the Fund's failure to do so increased its 2011 withdrawal liability by approximately $14 million.  (*Id.* at 1639.)

## C.  Arbitration Proceedings

The parties presented three issues to the arbitrator for decision.  The two issues pertinent to this action are: (1) whether Quad's obligation under the Versailles CBA to contribute to the Fund ceased in 2010 or 2011; and (2) in calculating Quad's withdrawal liability, whether the Fund properly applied the partial withdrawal credit before applying the 20-year cap.  (*Id.* at 4–5.)[3]

On the first issue, the arbitrator concluded that Quad's obligation under the Versailles CBA to contribute to the Fund ceased in 2011.  The arbitrator reasoned that: (1) the Versailles CBA required Quad to pay out all unused vacation and personal time to its employees from 2010; (2) vacation days could be used up until midnight on January 1, 2011; (3) Quad therefore could not calculate (and thus could not pay out) any unused vacation time to its employees until thereafter; and thus (4) Quad's obligation to contribute to the Fund based on those payments did not cease until 2011.  (*See id.* at 12–13, ¶¶ 31, 34, 35, 39; *id.* at 18–21.)  On the second issue, the arbitrator concluded that the wording and structure of the various statutes under the MPPAA supported the Fund's decision to apply the partial withdrawal credit before applying the 20-year payment cap.  (*Id.* at 21–23, ¶¶ 8–15.)

At the conclusion of the arbitration proceeding, both Quad and the Fund moved for an award of attorneys' fees based on the other's bad faith conduct during the

---

[3] The arbitrator declined to adjudicate the third issue.  (AR at 5.)  The parties do not challenge that decision here.

proceedings. (*Id.* at 24–25, ¶¶ 22.) Quad argued that: (1) the Fund lacked a good faith basis for seeking an additional evidentiary hearing on the second issue put before the arbitrator; and (2) the Fund lacked a good faith basis for attempting to submit several revised withdrawal assessments that were purposely inconsistent with the arbitrator's rulings. (*Id.*) The Fund, in turn, argued that Quad lacked a reasonable basis on which to assert the second issue regarding the sequence of withdrawal liability adjustments. (*Id.*) The arbitrator concluded (without explanation) that neither Quad nor the Fund had engaged in bad faith conduct, and thus denied their respective requests for fees and costs. (*Id.* at 25, ¶ 24.) Finally, the arbitrator also denied the Fund's motion to delay issuance of the final arbitration award based on Quad's "unclean hands." (*Id.* at 24, ¶ 21.)

**D.    Civil Action**

On May 17, 2016, the arbitrator issued his final award addressing all issues raised in the arbitration. (*Id.* at 2.) Both parties immediately filed separate civil actions to affirm and/or vacate the arbitrator's decision, which the Court consolidated into one action. (ECF No. 19.) On August 17, 2016, both parties timely moved to affirm and/or vacate the arbitrator's decision. (ECF Nos. 22, 23.) On November 21, 2016, the Court heard oral argument from the parties on their respective Motions, after which the Court took the Motions under submission. (ECF No. 34.) Those Motions are now before the Court for decision.

**III.    ISSUES PRESENTED**

The parties seek to affirm and/or vacate various portions of the arbitrator's final award. The Court rules on each issue as follows:

(1)    Quad asks this Court to affirm, and the Fund asks this Court to vacate, the arbitrator's decision that Quad's Versailles facility withdrew from the Fund in 2011 rather than 2010. The Court **VACATES** the arbitrator's decision.

(2)    The Fund asks this Court to vacate the arbitrator's decision that the Fund prepare only a revised 2011 complete withdrawal liability assessment. The Court

**DISMISSES AS MOOT** the Fund's challenge to the arbitrator's decision.

(3)    Quad asks this Court to vacate, and the Fund asks this Court to affirm, the arbitrator's decision that the Fund properly applied the partial withdrawal credit before applying the 20-year payment cap to the 2011 complete withdrawal assessment.  The Court **AFFIRMS** the arbitrator's decision.

(4)    Quad asks this Court to vacate the arbitrator's decision denying Quad's request for an award of attorneys' fees and costs against the Fund.  The Court **VACATES** the arbitrator's decision.

(5)    Quad asks this Court to affirm the arbitrator's decision denying the Fund's request for a delay in issuing the final arbitration award based on Quad's "unclean hands."  The Court **AFFIRMS** the arbitrator's decision.

## IV.    STANDARD OF REVIEW

An arbitrator's conclusions of law are reviewed de novo.  *Penn Cent. Corp. v. W. Conference of Teamsters Pension Trust Fund*, 75 F.3d 529, 533 (9th Cir. 1996).  An arbitrator's factual findings, however, are presumed correct, "rebuttable only by a clear preponderance of the evidence."  29 U.S.C. § 1401(c).  While the question "[w]hether a withdrawal within the meaning of the statute has occurred presents a mixed question of law and fact," *Penn Cent. Corp.*, 75 F.3d at 533, "[t]he construction of the CBA is a question of law that [is] review[ed] de novo."  *Nw. Adm'rs, Inc. v. San Bruno Garbage Co.*, 312 F. App'x 916, 918 (9th Cir. 2009) (citing *Santa Monica Culinary Welfare Fund v. Miramar Hotel Corp.*, 920 F.2d 1491, 1493 (9th Cir. 1990)); *see also Nw. Adm'rs, Inc. v. B.V. & B.R., Inc.*, 813 F.2d 223, 225 (9th Cir. 1987) (interpretation of the written terms of a CBA is a question of law to the extent that the language is not ambiguous).  Finally, "an award of attorneys' fees is reviewed for an abuse of discretion."  *Penn Cent. Corp.*, 75 F.3d at 535; *see also Trs. of Utah Carpenters' & Cement Masons' Pension Trust v. Loveridge*, 567 F. App'x 659, 662 (10th Cir. 2014).

/ / /

# V.    DISCUSSION

## A.    Issue 1: Quad's Withdrawal Under the Versailles CBA

The Fund argues that the arbitrator erred in concluding that Quad's obligation to contribute to the Fund survived the decertification of Local 826-C.  The Fund argues for a bright line rule that any obligation under a CBA to contribute to a pension plan ceases immediately upon NLRB confirmation of the decertification vote.  Any other rule, the Fund contends, would create uncertainty and litigation in an area of law that emphasizes administrative uniformity and simplicity.  Quad, on the other hand, argues that whether an employer's obligation to contribute to a pension plan survives decertification depends on the terms of the specific CBA at issue.  Here, because Versailles employees could take vacation any time up until January 1, 2011, it was impossible to determine before that date the amount of unused vacation time Quad would need to pay out.  Moreover, because the CBA required Quad to contribute to the Fund based on the payment of unused vacation time, Quad argues that its obligation to contribute to the Fund did not cease until at least January 1, 2011.  For the reasons discussed below, the Court concludes that Quad's obligation to contribute to the Fund under the Versailles CBA ceased immediately upon NLRB confirmation of the decertification vote.

An employer partially withdraws from a pension plan during a particular plan year "if, during such year, the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan."  29 U.S.C. § 1385(b)(2)(A)(ii).  Because the Fund's plan year ran from January 1 to December 31, the key issue is whether Quad "permanently cease[d] to have an obligation to contribute" to the Fund under the Versailles CBA during the 2010 calendar year or the 2011 calendar year.

The Ninth Circuit has held that decertification of an employee union prospectively voids any CBA between that union and the employer, and thus cuts off

any obligation under the CBA to contribute to a pension plan. *Sheet Metal Workers'*
*Int'l Ass'n, Local 206 of Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. W. Coast*
*Sheet Metal Co.*, 954 F.2d 1506, 1509–10 (9th Cir. 1992) (citing *Sheet Metal Workers*
*Int'l Ass'n, Local No. 162 v. Jason Mfg., Inc.*, 900 F.2d 1392, 1400 (9th Cir. 1990));
*see also MacKillop v. Lowe's Mkt., Inc.*, 58 F.3d 1441, 1446 (9th Cir. 1995) ("*Sheet*
*Metal Workers'* holds that the voluntary decertification of a union by its employees
ends the collective bargaining agreement, and employer obligations to the ERISA
plans cease upon that event."); *Laborers Health & Welfare Trust Fund for N. Cal. v.*
*Westlake Dev.*, 53 F.3d 979, 984 (9th Cir. 1995) ("The obligation to contribute to the
Trust Funds depends upon the existence of employment covered by the CBA.  Once
the CBA was lawfully repudiated, there was no longer any covered employment and
thus there was no duty on Westlake's part to contribute to the Trust Funds.");
*Laborers Health & Welfare Trust Fund For N. Cal. v. Advanced Lightweight*
*Concrete Co.*, 484 U.S. 539, 553 (1988) (noting in dicta that absent a statutory
obligation to the contrary, there "would [be] no basis whatsoever for claiming that an
employer had any duty to continue making contributions to a fund after the expiration
of its contractual commitment to do so").[4]  The court reasoned that "[a] contract to
contribute to a trust fund of a [u]nion with which [the employer] has no ongoing
collective bargaining relationship makes no sense," because "trust fund provisions
have no legal effect when the [u]nion is no longer the certified representative of [the]
employees." *W. Coast Sheet Metal Co.*, 954 F.2d at 1509; *see also id.* ("[B]ecause the
collective bargaining agreement became inoperative prospectively, it thereafter had no
force or legal effect.  Legal obligations have their source either in authority acting
within its proper jurisdiction or in contract properly executed and currently effective.

---

[4] It is unclear why both parties assume that the CBA becomes void upon NLRB confirmation of
the decertification vote rather than when the decertification vote itself occurs; *West Coast Sheet*
*Metal* appears to hold that the agreement is void upon the decertification vote, and never even
mentions NLRB confirmation of the vote.  954 F.2d at 1509–10.  Nevertheless, because the
difference would not affect the outcome here (both the decertification vote and NLRB confirmation
occurred in December 2010), the Court declines to definitively resolve the issue.

Here neither source exists."). The court also noted that it is unfair to force an employer to contribute to the pension plan of a union that no longer represents its employees, for such contributions could benefit only the employees of other employers. *Id.* at 1510. Similarly, the Fifth Circuit, relying on *West Coast Sheet Metal*, has held that decertification prospectively voids a CBA. *Pioneer Nat. Res. USA, Inc. v. Paper, Allied Indus., Chem. And Energy Workers Int'l Union Local 4-487*, 338 F.3d 440, 441 (5th Cir. 2003).[5] The Fifth Circuit further held that one consequence of decertification is that "employees los[e] all job protection under the CBA. With no promise of continued employment, they c[an] be discharged as at-will employees." *Id.*

Quad points to dicta in *West Coast Sheet Metal* suggesting that a contribution obligation under a CBA *might* survive decertification if the CBA specifically provided for such survival. 954 F.2d at 1509 ("We find nothing in the language of the renewal contract that obligates West Coast to continue to contribute to the Trust Funds after the Union's decertification."). Quad argues that this is in line with cases from the Supreme Court and other circuit courts holding more generally that CBA provisions can survive expiration of the CBA in certain circumstances. For example, in *Litton Fin. Printing Div. v. N.L.R.B.*, the Supreme Court held that while "an expired contract has by its own terms released all its parties from their respective contractual obligations," there are "[e]xceptions [that] are determined by contract interpretation." 501 U.S. 190, 206 (1991). Such exceptions include "[r]ights which accrued or vested under the agreement," and rights that the parties clearly intend to survive termination of the CBA. *Id.* The Court went on to hold that a provision in a CBA specifying the

---

[5] The Third Circuit has also noted in dicta the potential for a decertification defense. *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992). The Seventh Circuit, on the other hand, has held that decertification does not void a CBA, reasoning that the lack of majority support for a union (which is the basis of a decertification defense) is generally not a defense to a contribution action. *See Cent. States, Se. & Sw. Areas Pension Fund v. Schilli Corp.*, 420 F.3d 663, 671 (7th Cir. 2005). Curiously, the Ninth Circuit has similarly held that lack of majority support for a union is not a defense to a contribution action, yet retains the rule that decertification cuts off the obligation to contribute to a pension plan under a CBA. *MacKillop*, 58 F.3d at 1444.

framework employers must use to lay off employees was not intended to survive termination of the agreement, because the framework was based on factors that could not possibly remain constant following the termination. *Id.* at 209–10. Similarly, the First Circuit has held that earned vacation time survives termination of a CBA because those benefits accrue to the employee during the life of the CBA. *United Parcel Serv., Inc. v. Union De Tronquistas De Puerto Rico, Local 901*, 426 F.3d 470, 473–74 (1st Cir. 2005) ("Vacation time strikes us as the classic example of a benefit that—barring explicit provision to the contrary—accrues during the term of the agreement under which it is earned.").

The Court declines to decide whether decertification always and immediately terminates any contribution obligation under a CBA, because even if it does not, nothing in the Versailles CBA specifically extended Quad's obligation to contribute to the Fund into 2011. The three relevant provisions under the Versailles CBA are: (1) employees may take vacation time at any time between January 1 to December 31; (2) any unused vacation time remaining after this period will be paid out by January 31 of the following year; and (3) contributions to the Fund must be made based on such end-of-year vacation time payouts. However, the CBA does not explicitly provide that any of these obligations continue past expiration or termination of the CBA. Moreover, there is nothing implicit in the nature of these obligations that compels such a conclusion. The mere fact that the CBA imposes an obligation to occur at some point in the future does not mean that the obligation will survive if the CBA terminates before then; any other rule would create significant line-drawing issues. Indeed, CBAs by their very nature contemplate performance of all obligations thereunder for a defined period of time (e.g., payment of wages, regulation of working conditions, etc.), yet no one suggests that all of those obligations must remain in effect if the CBA terminates early.[6] *Cf. Pioneer Nat. Res. USA*, 338 F.3d at 441 ("When the

---

[6] The Court also notes that the period in which one must use their vacation time (as opposed to the right to the vacation time itself) is not a right that accrued or vested during the lifetime of the CBA, and Quad does not appear to argue to the contrary.

Union was decertified, [its] employees lost all job protection under the CBA.").  In short, there is nothing to distinguish these obligations from the myriad other obligations under the CBA that clearly did *not* survive decertification.

Thus, the fact that the CBA provides that employees can take vacation at any time before the end of 2010 does not mean that they may still do so if the CBA terminates *before* the end of the year.  Instead, once the agreement terminates, this provision ceases to exist and is no longer enforceable.  As a result, any vacation time remaining in the employees' banks upon decertification constitutes the total unused vacation time that Quad owes its employees—at least as far as the CBA is concerned.  Because of this, the CBA no longer imposed an obligation to contribute to the Fund that Quad could fulfill only after January 1, 2011; Quad could fulfill its obligation to contribute to the Fund based on unused vacation time in December 2010.  And because there is no dispute that the obligation to contribute under the Versailles CBA ceased when the unused vacation time payouts *could* be paid rather than when they *were actually* paid, Quad's Versailles facility partially withdrew from the Fund during the 2010 plan year.[7]

Both Quad and the arbitrator rely on the Supreme Court's opinion in *Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers Union, AFL-CIO*, 430 U.S. 243 (1977), but that case does not require a different result.  There, the Supreme Court held that certain types of arbitration provisions in a CBA are presumed to survive its expiration unless the CBA specifically provides otherwise.  *Id.* at 254.  The Court reasoned that the liberal federal policy favoring arbitration generally and arbitration of collective bargaining disputes in particular warranted such a presumption.  *Id.*  The CBA provisions at issue here, however, do not involve arbitration.  For provisions not relating to arbitration, the presumption regarding survivability is reversed: such provisions do *not* survive expiration of the CBA unless

---

[7] The arbitrator's conclusion to the contrary is based solely on the written terms of the Versailles CBA.  Because the interpretation of unambiguous plan terms is a legal question, the arbitrator's conclusion not entitled to any deference.  *Nw. Adm'rs*, 813 F.2d at 225.

a recognized exception applies. *See Litton*, 501 U.S. at 206. Quad also does not point to any comparable policy favoring survival of the disputed provisions—indeed, Quad spends much of its briefing arguing that policy concerns should *not* change the outcome here. Thus, the Court finds *Nolde Brothers* unpersuasive.

For these reasons, the arbitrator erred in concluding that Quad's Versailles facility withdrew from the Fund in 2011 rather than 2010.

**B.     Issue 2: The 2011 Complete Withdrawal Assessment**

Following the arbitrator's interim decision that Quad's Versailles facility withdrew in 2011 rather than 2010, the Fund requested that the arbitrator adjudicate the date of withdrawal for all of Quad's other facilities. The Fund argued that the arbitrator's decision created a new "rule" that would change the dates of withdrawal at Quad's other facilities, which in turn would significantly affect Quad's total withdrawal liability. The arbitrator declined to do so because (1) the Fund had previously stipulated that Quad's other facilities (except the Memphis facility) withdrew in 2011, and (2) it was too late in the proceedings to raise new issues. Thus, the arbitrator ordered the Fund to rescind the 2010 partial withdrawal assessment and submit a revised 2011 complete withdrawal assessment. The Fund now argues that the arbitrator erred in declining to adjudicate the withdrawal date of Quad's other facilities.

Because the Court vacates the arbitrator's decision that the Versailles facility withdrew in 2010, this issue is now moot. As such, the Court expresses no opinion on (1) whether the Court's analysis regarding the contribution obligation applies to the other CBAs under which Quad was bound, or (2) whether the arbitrator properly declined to consider those issues based on the Fund's failure to timely preserve them for adjudication.

**C.     Issue 3: Application of the Partial Withdrawal Credit**

In assessing Quad's 2011 complete withdrawal liability, the Fund applied two adjustments: the partial withdrawal credit, 29 U.S.C. § 1386(b)(1), and the 20-year

payment cap, 29 U.S.C. § 1399(c)(1)(B). Under the partial withdrawal credit, the Fund offset Quad's 2011 complete withdrawal liability by the amount assessed for the 2009 Memphis partial withdrawal. *See* 29 C.F.R. § 4206.1(a) ("The purpose of the credit is to protect a withdrawing employer from being charged twice for the same unfunded vested benefits of the plan."). Under the 20-year payment cap, the Fund limited Quad's 2011 withdrawal liability to the first 20 years of amortized payments. The Fund applied the partial withdrawal credit before applying the 20-year payment cap; Quad argues that the Fund should have applied the 20-year payment cap before the partial withdrawal credit. The arbitrator concluded that the Fund applied the credit and the payment cap in the correct sequence. For the reasons discussed below, the Court affirms the arbitrator's holding.

**1.    Relevant Statutes**

Quad's argument implicates the interaction between three sections of the MPPAA: 29 U.S.C. §§ 1381, 1386, and 1399.

**i.    29 U.S.C. § 1381**

Under § 1381(a), "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under [29 U.S.C. §§ 1381–1405]." 29 U.S.C. § 1381(a). Subsection (b)(1), in turn, lays out a roadmap for determining an employer's withdrawal liability (whether partial or complete):

> For purposes of subsection (a) of this section--
> (1) The withdrawal liability of an employer to a plan is the amount determined under section 1391 of this title to be the allocable amount of unfunded vested benefits, adjusted--
> (A) first, by any de minimis reduction applicable under section 1389 of this title,
> **(B) next, in the case of a partial withdrawal, in accordance with section 1386 of this title,**
> **(C) then, to the extent necessary to reflect the limitation on annual payments under section 1399(c)(1)(B) of this title**, and
> (D) finally, in accordance with section 1405 of this title.

29 U.S.C. § 1381(b) (emphasis added).  While subsections (b)(1)(B) and (b)(1)(C) are the most directly relevant portions of this statute, the overall structure of this entire section is also relevant.

### ii.    29 U.S.C. § 1386

This statute concerns withdrawal liability calculations in the event of a partial withdrawal.  The two relevant subsections under this statute are subsections (a) and (b)(1).  Subsection (a) provides a formula for determining "[t]he amount of an employer's liability for a partial withdrawal, before the application of sections 1399(c)(1) and 1405 of this title."  29 U.S.C. § 1386(a).  Subsection (b)(1), which is the partial withdrawal credit, reads as follows:

> In the case of an employer that has withdrawal liability for a partial withdrawal from a plan, any withdrawal liability of that employer for a partial or complete withdrawal from that plan in a subsequent plan year shall be reduced by the amount of any partial withdrawal liability (reduced by any abatement or reduction of such liability) of the employer with respect to the plan for a previous plan year.

29 U.S.C. § 1386(b)(1).

### iii.    29 U.S.C. § 1399

Finally, this statute concerns the 20-year payment cap on withdrawal liability.  The relevant language reads as follows:

> **(A)(i)** Except as provided in subparagraphs (B) and (D) of this paragraph . . . , an employer shall pay the amount determined under section 1391 of this title, adjusted if appropriate first under section 1389 of this title and then under section 1386 of this title over the period of years necessary to amortize the amount in level annual payments determined under subparagraph (C) . . . .
> . . .
> **(B)** In any case in which the amortization period described in subparagraph (A) exceeds 20 years, the employer's liability shall be limited to the first 20 annual payments determined under subparagraph (C).

29 U.S.C. § 1399(c)(1).

## 2. Analysis

### i. Statutory Analysis

The Court agrees with the arbitrator's conclusion that the partial withdrawal credit is applied before the 20-year payment cap. Section 1381's calculation sequence makes clear that this is the appropriate order. There is no dispute that the adjustments under § 1381(b)(1)(B) come before the 20-year payment cap adjustment under § 1381(b)(1)(C); thus, the question becomes whether the partial withdrawal credit falls under subsection (b)(1)(B). That subsection requires, "in the case of a partial withdrawal," that the Fund adjust the employer's liability "in accordance with section 1386 of this title." Here, even though the Fund was calculating Quad's 2010 complete withdrawal, the entire matter was nevertheless a "case of partial withdrawal" because Quad partially withdrew from the Fund in 2009. In other words, the word "case" refers not just to the particular assessment being calculated (as Quad contends), but more broadly to any situation where a withdrawal assessment is affected by the existence of a partial withdrawal. Thus, under § 1381(b)(1)(B), the Court must apply *all* adjustments found in § 1386. There are two adjustments found in § 1386: the formula for determining partial withdrawal liability under subsection (a), and the partial withdrawal credit in subsection (b). Because the Fund was calculating Quad's 2011 complete withdrawal, subsection (a) was inapplicable. However, because the Fund assessed liability for a partial withdrawal in 2009, Quad was entitled to the partial withdrawal credit from subsection (b). As a result, the Fund correctly applied this credit under § 1381(b)(1)(B) before applying the 20-year payment cap under § 1381(b)(1)(C).

Quad argues that the partial withdrawal credit does not fall under § 1381(b)(1)(B) because this does not concern a "case" of partial withdrawal—rather, it concerns a "case" of complete withdrawal to which one applies the partial withdrawal *credit*. The Court finds this unconvincing for multiple reasons. First, the partial withdrawal credit applies to withdrawal liability assessed in subsequent years

16

*regardless* whether the withdrawal in those subsequent years is partial or complete. § 1386(b)(1). Under Quad's reasoning, however, § 1381(b)(1)(B) would refer to the partial withdrawal credit if the subsequent years were a partial withdrawal—but not if they were complete withdrawals. This makes no sense. Quad gives no reason why the sequence in which the partial withdrawal credit is applied should differ based on whether the withdrawal in the subsequent year is partial or complete.

Second, § 1381(b)(1)(B) broadly refers to adjustments to be made "in accordance with section 1386 of this title"; thus, by its very terms, it is not limited to adjustments only under certain subsections of § 1386. If Congress intended such a limitation, it could clearly have provided for such. Indeed, the very next subsection of the same statute (i.e., § 1381(b)(1)(C)) specifically identifies the particular subsection of the statute to which it is referring (i.e., § 1399(c)(1)(B)), thus making clear that Congress' failure to do so under § 1381(b)(1)(B) was not simply an oversight. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citations and internal quotation marks omitted)). Alternatively, Congress could have placed the partial withdrawal credit in another section of the statute entirely, which again would have made clear that § 1381(b)(1)(B) does not refer to the partial withdrawal credit.

Third, the congruity in the language between § 1381(b)(1)(B) and § 1386(b)(1) convinces the Court that Congress affirmatively intended for the former to refer to the latter. Section 1381(b)(1)(B) applies "in the case of a partial withdrawal." Section 1386(b)(1), in turn, states that the partial withdrawal credit applies "[i]n the case of an employer that has withdrawal liability for a partial withdrawal from a plan." This similarity in language substantially undermines Quad's argument that the phrase "case of partial withdrawal" in § 1381(b)(1)(B) refers only to the specific withdrawal assessment being calculated rather than to any situation where a partial withdrawal

may impact the assessment being calculated.

Fourth, § 1381(b)(1) quite clearly lays out an all-inclusive sequence of adjustments to apply in determining withdrawal liability. In fact, an argument could be made that § 1381(b)(1) is not just a roadmap for calculating withdrawal liability, but actually *defines* "withdrawal liability" for the purposes of that part of the MPPAA. § 1381(b)(1) ("The withdrawal liability of an employer to a plan *is* the amount determined under section 1391 . . . adjusted [f]irst . . . next . . . then . . . finally . . . ." (emphasis added)). Quad's argument that the partial withdrawal credit is applied outside this sequence of calculations cannot be reconciled with the all-encompassing nature of § 1381(b)(1). Indeed, § 1381(b)(1)(D) describes the "first" and "final[]" adjustments to be made to the § 1391 amount, yet those adjustments would clearly not be the "first" and "final[]" adjustments if—as Quad contends—there is yet a *further* adjustment to be made to account for the partial withdrawal credit.

Finally, the language of § 1399 also makes clear that the payment cap is applied only after the partial withdrawal credit is applied. Under § 1399(c)(1)(B), withdrawal liability is capped where the "amortization period described in subparagraph (A) exceeds 20 years." Subparagraph (A), in turn, requires the amortization of withdrawal liability that has been calculated under "section 1391 of this title, adjusted if appropriate first under section 1389 of this title and then under section 1386." (This sequence mirrors portions of the sequence set out in § 1381(b)(1).) And, again, there is nothing in subparagraph (A) that limits the adjustments to be made under § 1386. Thus, the withdrawal liability calculation in subparagraph (A) must include any partial withdrawal credit. And because the 20-year payment cap applies only to the withdrawal liability calculated under subparagraph (A), the cap necessarily comes after the credit.

### ii. PBGC Opinion Letter

Quad argues that the Court should defer to an opinion letter written by the Pension Benefit Guaranty Corporation (PBGC) that concluded that the 20-year

payment cap should be applied before the partial withdrawal credit.  In that letter, the PBGC opined as follows:

> Section [1386(b)(1)] itself makes clear that [the partial withdrawal credit] is not an adjustment under Section [1381(b)(1)].  Section [1386(b)(1)] states that "any withdrawal liability of that employer for a partial or complete withdrawal from that plan in a subsequent year shall be reduced."  [First], it is an adjustment to withdrawal liability, i.e. a further adjustment to the Section [1381(b)(1)] amount.  Second, it applies to either a partial or complete withdrawal while Section [1381(b)(1)(B)] applies only to a partial withdrawal.  Thus, Section [1386(b)(1)] is not an adjustment under Section [1381(b)(1)] at all . . . .

(AR at 626–27.)[8]

The PBGC is "the federal agency responsible for interpreting ERISA," *Penn Cent. Corp.*, 75 F.3d at 534, and thus the Court owes deference to the PBGC's interpretation of ERISA and MPPAA if required under *Chevron* and *Skidmore*.  *See, e.g.*, *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 648 (1990); *Mead Corp. v. Tilley*, 490 U.S. 714, 722 (1989); *Beck v. PACE Int'l Union*, 551 U.S. 96, 104 (2007).  Under *Chevron*, the Court applies a two-part test to determine whether to defer to an agency's construction of a statute.  "First, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  *City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1868 (2013) (citations omitted).  "But 'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the

---

[8] PBGC staff reached the same conclusion in March 2016 during an informal question-and-answer session with representatives of the Enrolled Actuaries Program Committee.  *See Questions to the PBGC and Summary of Their Responses* at 33, http://www.pbgc.gov/documents/2016bluebook.pdf (last visited Apr. 16, 2017).  However, the PBGC cautioned that those conclusions "are merely the current views of the individual[ PBGC staff members] and do not represent the positions of the Pension Benefit Guaranty Corporation or of any other governmental agency and cannot be relied upon by any person for any purpose."  *Id.* at 2.

agency's answer is based on a permissible construction of the statute.'" *Id.* (citations omitted).

"Where *Chevron* is inapplicable, reasonable agency interpretations may still carry 'at least some added persuasive force.'" *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 826 (9th Cir. 2012) (en banc) (quoting *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 136 (1997)). Under *Skidmore*, "an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires." *Mead Corp.*, 533 U.S. at 234 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). "Under this level of review, [the court] look[s] to the process the agency used to arrive at its decision. Among the factors [the court] consider[s] are the interpretation's thoroughness, rational validity, consistency with prior and subsequent pronouncements, the logic and expertness of an agency decision, the care used in reaching the decision, as well as the formality of the process used." *Tablada v. Thomas*, 533 F.3d 800, 806 (9th Cir. 2008) (citations, internal quotation marks, and brackets omitted).

The Court concludes that the PBGC's opinion does not warrant *Chevron*-style deference for two reasons. First, agency opinion letters do not warrant *Chevron* deference. *See, e.g.*, *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters . . . do not warrant *Chevron*-style deference."); *CenTra, Inc. v. Cent. States, Se. And Sw. Areas Pension Fund*, 578 F.3d 592, 601 (7th Cir. 2009) (holding that PBGC opinion letters are not entitled to *Chevron* deference but may be entitled to *Skidmore* deference).[9] Second, the Court in any event concludes that there is no ambiguity under the MPPAA as to whether the 20-year payment cap should be applied before the partial withdrawal credit. While the

___

[9] To the extent the Ninth Circuit's pre-*Christensen* cases hold otherwise, *see, e.g.*, *Penn Cent. Corp.*, 75 F.3d at 534; *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for N. Cal.*, 859 F.2d 808, 813 (9th Cir. 1988), they are no longer good law.

phrase "in the case of a partial withdrawal," § 1381(b)(1)(B), could have been more clearly worded, the remaining language and structure of this and other sections of the MPPAA concerning the calculation of withdrawal liability leaves no doubt that the partial withdrawal credit comes before the 20-year payment cap. The PBGC's contrary conclusion cannot supersede unambiguous statutory language. *City of Arlington*, 133 S. Ct. at 1868. Finally, the Court concludes that the opinion letter carries little or no added persuasive force under *Skidmore*. The PBGC's opinion does not address the myriad arguments that cut strongly against its interpretation, and the PBGC does not appear to rely on any specialized knowledge or expertise in reaching its conclusion. Rather, the agency appears simply to interpret (in a very curt fashion) the plain language of the statute—something that an Article III court is at least as well equipped to do as the PBGC. For these reasons, the PBGC's opinion letter does not warrant a different outcome.

**D.    Issue 4: Attorneys' Fees and Costs**

Quad argues that the arbitrator erred in concluding that the Fund did not act in bad faith during the arbitration process. Specifically, Quad argues that the Fund improperly attempted to submit revised assessments that it knew was contrary to the arbitrator's findings and orders. Quad also argues that the Fund unnecessarily multiplied the proceedings by seeking a further evidentiary hearing on the sequencing of adjustments, even though it had no new relevant evidence to present.

In an arbitration concerning withdrawal liability under ERISA, "[t]he arbitrator may require a party that initiates or contests an arbitration in bad faith or engages in dilatory, harassing, or other improper conduct during the course of the arbitration to pay reasonable attorneys' fees of other parties." 29 C.F.R. § 4221.10(c). As previously noted, the decision whether to award discretionary attorneys' fees is reviewed for abuse of discretion. *See Van Gerwen v. Guar. Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000); *McCabe v. Arave*, 827 F.2d 634, 640 (9th Cir. 1987); *Loveridge*, 567 F. App'x at 662 (applying abuse of discretion standard to the question

whether or not a party acted in bad faith within the meaning of § 4221.10(c)). The Ninth Circuit has held that the failure to explain the basis of a fee award constitutes an abuse of discretion. *See Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 737 (9th Cir. 2016); *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009) (the district court "must explain how it arrived at its determination with sufficient specificity to permit an appellate court to determine whether the district court abused its discretion in the way the analysis was undertaken"); *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1213 (9th Cir. 1986).

While the arbitrator's decision here did not concern the method for calculating an amount of attorneys' fees, the Court nonetheless concludes that the question whether a party acted in bad faith for the purposes of awarding attorneys' fees involve the same kind of fact-intensive inquiries that are best suited for determination by the arbitrator in the first instance. *See Trs. of Utah Carpenters' & Cement Masons' Pension Trust v. Loveridge*, No. 2:10-CV-00809-DS, 2012 WL 2522596, at *8 (D. Utah June 28, 2012) ("When an arbitrator engages in fact-intensive inquiry, such as deciding whether a party has engaged in improper conduct, the Court refrains overturning findings except for clear error, as the arbitrator 'is by far best-situated to assess these myriad [facts] and determine whether' such an event occurred." (citations omitted)); *Dague v. City of Burlington*, 976 F.2d 801, 804 (2d Cir. 1991) ("[W]hen questions are presented such as the amount of recovery, the extent to which a plaintiff is a prevailing party, and what if any adjustment is to be given for delay in payment, determination of a reasonable attorney's fee under the fee-shifting statutes should normally be decided by the district court in the first instance. . . . We allocate this task to the district court because it is 'intimately familiar with the nuances of the case, and is in a far better position to make certain decisions than is an appellate court.' An appellate panel is simply not equipped to give proper consideration to the many-faceted factual disputes that may affect a claim for attorney's fees. The types of evidence presented on an application such as the one in this case can normally be best

reviewed and analyzed by a district court judge." (citations and internal quotation marks omitted)). Moreover, it is impossible for this Court to meaningfully review the arbitrator's decision without any explanation as to how he arrived at that decision. *McCown*, 565 F.3d at 1102; *see Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 637 (9th Cir. 2009) ("[F]ailure to explain [its conclusion] is yet another factor to consider in reviewing the administrator's decision for abuse of discretion."). The Court therefore concludes that the arbitrator abused his discretion by failing to explain why the Fund's conduct was not improper and did not constitute bad faith. *Id.*; *Stanger*, 812 F.3d at 737. On remand, the arbitrator should provide such an explanation to permit adequate review by this Court.

**E.      Issue 5: Unclean Hands**

Finally, Quad asks this Court to affirm the arbitrator's order denying the Fund's request to a delay issuing the final arbitration award based on Quad's "unclean hands." The Fund does not respond to this argument, and thus concedes it. *See, e.g.*, *Scognamillo v. Credit Suisse First Boston LLC*, No. C03-2061 TEH, 2005 WL 2045807, at *7 (N.D. Cal. Aug. 25, 2005), *aff'd*, 254 F. App'x 669 (9th Cir. 2007). The Court therefore affirms the arbitrator's ruling in this respect.

## VI.      CONCLUSION

For the reasons discussed above, the Court concludes as follows:

(1)      The Court **VACATES** the arbitrator's decision that Quad's Versailles facility withdrew from the Fund in 2011;

(2)      The Court **DISMISSES AS MOOT** the Fund's challenge to the arbitrator's decision that the Fund assess only a 2011 complete withdrawal;

(3)      The Court **AFFIRMS** the arbitrator's decision that the Fund correctly applied that the partial withdrawal credit before the 20-year payment cap;

(4)      The Court **VACATES** the arbitrator's decision that Quad was not entitled to an award of attorneys' fees and costs under 29 C.F.R. § 4221.10(c); and

(5)      The Court **AFFIRMS** the arbitrator's decision not to delay issuance of

the final arbitration award based on Quad's "unclean hands."

(6)     Except as to the issues on which the Court has affirmed the arbitration award, the Court **REMANDS** the case to the arbitrator for proceedings not inconsistent with this opinion.

The Court further **ORDERS** the parties to submit a joint proposed judgment to the Court no later than **May 1, 2017**.  If the parties are unable to agree on the form of a judgment, they each may submit a proposed judgment.  In that event, objections to the other party's judgment shall be filed no later than **May 4, 2017**, and shall not exceed five pages.

**IT IS SO ORDERED.**

April 19, 2017

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**